IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:  1:10-cv-01413-WJM-KMT

DARLENE MALDONADO; and
ANGEL MALDONADO,

      Plaintiffs,

v.

ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY,

      Defendant.

---

## PLAINTIFFS' RESPONSE TO DEFENDANT ALLSTATE INSURANCE COMPANY'S MOTION FOR DETERMINATION OF QUESTION OF LAW AND BRIEF IN SUPPORT

---

Plaintiffs Darlene and Angel Maldonado (hereinafter collectively referred to as "the Maldonados"), by and through their attorneys of record, Ranson & Kane, P.C., hereby submit this Response to Defendant Allstate Insurance Company's Motion for Determination of Question of Law and Brief in Support ("Motion") and state as follows:

### I.  INTRODUCTION

This case arises out of a coverage dispute between the Maldonados and their homeowner's insurance carrier, Allstate Fire and Casualty Insurance Company ("Allstate").  Allstate insured the Maldonados' property at 780 E. Clarion Drive in Pueblo West, Colorado ("Pueblo West Home").  In 2009, while the Maldonados were in Texas, the pipes in the attic of the home froze and burst, causing water damage to the home. Allstate denied the Maldonados' insurance claim for the water damage because,

Allstate alleged, the home was unoccupied at the time of the loss and the Maldonados failed to use reasonable care to maintain heat in the home.  The Maldonados subsequently filed a lawsuit against Allstate and have alleged a breach of contract, bad faith breach of contract, and violation of C.R.S. §§ 10-3-1115 and 10-3-1116 for unreasonably denying first-party benefits.

Allstate does not state the authority under which it files its Motion.  However, Allstate's Motion requests that the Court make certain determinations as a matter of law regarding issues that the Maldonados allege are open to contrary interpretations or raise disputed issues of fact.  Therefore, the Maldonados treat this Motion as a Motion for Partial Summary Judgment.

As set forth below, regarding the two issues raised in Allstate's Motion, the Maldonados assert that 1) contrary to Allstate's position, the principles of contract interpretation dictate that the Court find that the Maldonados' home was *not* unoccupied at the time of the loss; and 2) even if the Court does find that the home was unoccupied at the time of the loss, a factual dispute exists as to whether the Maldonados used reasonable care to heat the home in their absence. As such, Allstate is not entitled to partial summary judgment.

## II.  RESPONSE TO STATEMENT OF UNDISPUTED FACTS

The Maldonados respond to Allstate's statement of undisputed facts as follows:

1. The Maldonados admit that they own the Property located at 780 E. Clarion Drive, Pueblo West, Colorado  81007.

2

2. The Maldonados admit that the Property was insured by Allstate pursuant to Policy number 000920927157.

3. Allstate alleges that Angel Maldonado is in the military and Darlene Maldonado was to stay with her husband Angel Maldonado at Ft. Hood in Texas starting in July 2009 until July 2010.  The Maldonados admit that Angel Maldonado is in the military and that he was stationed at Ft. Hood beginning in 2009.  However, the Maldonados deny that the Maldonados had intentions of staying in Texas from July 2009 to July 2010.  While Darlene Maldonado did spend time in Texas with her husband, in July 2009 the Maldonados did not know how long Sgt. Maldonado would be required to stay at Ft. Hood, as his orders transferring him to Ft. Hood did not give an ending date.  However, Sgt. Maldonado's supervisor at Ft. Carson did indicate that his stay would be no more than one year.  Ex. 1, Deposition of Angel Maldonado, pp. 8-9.

4. Allstate alleges that during the months of November and December 2009, beyond the pilot light, the Maldonados did not have the heat on at the Property as evidenced by therm usage.  The Maldonados deny this assertion.  The heating system in the home was not turned off and that the thermostat was set at 55 degrees during that time.  Ex. 1, pp. 25, 41, 51, 52.  Ex. 2, Deposition of Darlene Maldonado, p. 93.

5. The Maldonados admit that the water pipes at the Property had frozen prior to the December 2009 incident.

3

6. Allstate alleges that the Maldonados were aware that if they failed to heat the Property during the winter months of November and December 2009, the pipes at the Property could freeze and break.  The Maldonados deny this statement. As set forth in paragraph 4, above, the Maldonados did not fail to heat the home. Further, the section of pipe in the Pueblo West Home that froze and burst was located in the attic of the home and could have frozen regardless of the heat usage inside the home.  Ex. 3, Deposition of Steven Dennison, p. 14; Ex. 4, Deposition of Ernie Bernal, p. 20.  Additionally, the Maldonados took additional measures to attempt to prevent the pipes from freezing, including ensuring that the pipes in the attic were adequately covered by insulation and arranging for Mrs. Maldonado's father, Ernie Bernal, to periodically visit the house in their absence.  Ex. 1, Deposition of Angel Maldonado, pp. 50, 51; Ex. 4, Deposition of Ernie Bernal, pp. 7-9.

7. Allstate alleges that despite knowing that the pipes at the Property were susceptible to freezing, the Maldonados failed to take any measures to ensure the pipes at the Property would not freeze and/or burst.  The Maldonados deny this assertion and state that they did take measure to prevent the freezing and/or bursting of the pipes, as set forth in paragraphs 4 and 6 above.

8. Allstate alleges that the Maldonados have admitted that they were not occupying the Property during the months of November and December 2009.  The Maldonados admit that during their depositions, they did state that the house

4

was "unoccupied."  However, the Maldonados made such statements using a layperson's definition without the benefit of knowing the case law surrounding the definition and without knowledge as to how courts have previously construed this undefined term.  As set forth below, based on how some courts have construed the term "unoccupied," the circumstances in this case do not meet the definition.  The Maldonados did not intend to stay in Texas permanently and left most of their personal belongings in the Pueblo West Home while they were in Texas.  Ex. 1, Deposition of Angel Maldonado, pp. 9, 17, 31, 32; Ex. 2, Deposition of Darlene Maldonado pp. 8, 9, 32, 48, 54, 71, 95.

9.  The Maldonados admit that on December 17, 2009, the City of Pueblo discovered the water loss at the Property and shut off the water supply to the Property.

10. The Maldonados admit that on December 24, 2009, the Maldonados arrived at the Property, observed the water damage and reported the loss to Allstate.

11. Allstate alleges that based on information provided by the Maldonados that they were not currently residing at the Property, Allstate requested the Xcel Energy bills for the Property to determine if the Property was adequately heated at the time of the loss.  The Maldonados admit that Allstate requested the Xcel Energy bills for the Property.  To the extent that this assertion suggests that the home was unoccupied at the time of the loss, the Maldonados deny this statement.

The home was not unoccupied at the time of the loss, as set forth in paragraph 8 above.

12. Allstate alleges that upon receipt of the Xcel Energy bills, Allstate concluded that there was insufficient heat at the Property to prevent the pipes from freezing and/or bursting while the Property was unoccupied.  The Maldonados admit that Allstate made said conclusion.  The Maldonados deny that the information contained in the bills that Allstate received was sufficient to constitute a complete investigation regarding the heat in the home.  Allstate relied on the November and December Xcel energy bills in their investigation.  Ex. 5, Deposition of Phillip Spallo, pp. 25, 26.   The December bill was generated on December 8, 2009.  Ex. 6, Xcel Energy Bill, Defendant's Bates No. AIC00084-AIC00086.  The freeze loss was discovered on December 17, 2009.  Defendant's Statement of Undisputed Facts, paragraph 9.  Allstate made said determination without any information regarding thermal usage during the period of time immediately prior to the freeze loss.  Finally, the Maldonados deny that the Property was unoccupied, as set forth in paragraph 8 above.

13. Allstate alleges that the Maldonados have failed to provide evidence to support their contention that the Property was adequately heated at the time of the loss.  The Maldonados deny this statement.  Angel Maldonado testified during his deposition that while he was in Texas, the thermostat on the heating system in the Pueblo West Home was set at 55 degrees.  Ex. 1, Deposition of Angel

Maldonado, pp. 25, 41, 51.  Both Sgt. and Mrs. Maldonado testified that at no point while they were in Texas was the heating system in the Pueblo West Home ever turned off.  Ex. 1, Deposition of Angel Maldonado, p. 51, 52; Ex. 2, Deposition of Darlene Maldonado, p. 93.  Finally, Sgt. Maldonado testified that he had made attempts to ensure the pipes in the attic were adequately covered with insulation.  Ex. 1, Deposition of Angel Maldonado, pp. 50, 51.

14. Allstate alleges that Allstate investigated the claim and subsequently denied it based on Exclusion A of the Policy which states in relevant part:

> We do not cover loss to the property described in Coverage A – Dwelling Protection or Coverage B – other Structures Protection consisting of or caused by the following:
>
> 1.      Freezing of:
>
> a)      plumbing, fire protective sprinkler systems, heating or air conditioning systems;
>
> b)      household appliances; or
>
> c)      swimming pools, hot tubs and spas within the dwelling, their filtration and circulation systems.
>
> Or discharge, leakage or overflow from within a), b), or c) above, caused by freezing, while the building structure is vacant, unoccupied or being constructed unless you have used reasonable care to:
>
> a)  maintain heat in the building structure; or

b) shut off the water supply and drain the system and appliances. The Maldonados deny the statement that Allstate "investigated the claim" to the extent that it implies that Allstate conducted a complete and thorough investigation, as set forth in paragraph 12 above.  The Maldonados admit that Allstate denied the Maldonados' claim based on said exclusion.

15. The Maldonados admit that on May 23, 2011, pursuant to a subpoena issued to Xcel Energy, Allstate received Xcel Energy payment history, energy consumption and bills for the Property from November 2010 dating back to May 2006.

## III. STATEMENT OF ADDITIONAL DISPUTED FACTS

1. When Mrs. Maldonado left Colorado to go to Texas with her husband, she intended to return to Colorado for periodic visits and to ultimately reside there permanently.  Ex. 2, Deposition of Darlene Maldonado p. 8, 9.

2. Mrs. Maldonado began working at Prairie Wind Elementary in 2005.  Ex. 2, pp. 11, 91.  Mrs. Maldonado took the 2009-2010 school year off to allow her to spend time with her husband in Texas with the understanding that her job would be open to her upon her return the following year.  Ex. 2, pp. 12, 91, 92.

3. When Mrs. Maldonado left Colorado to go to Ft. Hood in 2009, she took only one small bag of her belongings with her.  Ex. 2, p. 54.  Sgt. Maldonado took only clothing and basic kitchen items with him to Ft. Hood.  Ex. 1, p. 9.

4. The Maldonados left their remaining personal items, including furniture and other clothing, at the Pueblo West Home while they were in Texas.  Ex. 1 pp. 9, 17, 31-32; Ex. 2 pp. 32, 48, 54, 71, 95.

5. The Maldonados planned to return to the Pueblo West Home approximately every other month, and arranged to have Mrs. Maldonados' father, Ernie Bernal, check on the home on the months that they did not return.  Ex. 2, p. 13.

6. Mr. Bernal did visit the Pueblo West Home and on such visits stayed at the home for several hours or overnight.  Ex. 4, Deposition of Ernie Bernal, pp. 7-9.

7. The Maldonados bought a trailer to serve as a temporary residence during their stay in Texas and intended to return to the Pueblo West Home.  Ex. 2, p. 8, 9.

8. The Maldonados intended for the Pueblo West Home to be their retirement home.  Ex. 2, p. 93.

9. Steve Dennison, who owns Flood Damage Restoration and visited the Pueblo West Home shortly after the freeze loss occurred to assess the damage, testified that at the time he entered the house, the house looked occupied, that it was furnished, and that the heat, power, and electricity were on.  Ex. 3, Deposition of Steve Dennison, pp. 4, 13, 17.

10. Allstate's 30(b)(6) deponent, Randy Collins, stated during Allstate's deposition that for terms not defined in the policy, adjusters are instructed to use the "normal understanding of that term."  If in doubt, the adjusters are instructed to use the definition found in a dictionary, though Allstate does not require or

suggest the use of any dictionary in particular.  Ex. 7, Deposition of Allstate, pp. 45, 46.

11. Mr. Collins stated during Allstate's deposition that under Allstate's insurance policy, the term "unoccupied" indicates that no one is in the house.  Further, he explained that a home becomes unoccupied as soon as the individuals occupying the home leave for any reason, including to run an errand or step next door to visit a neighbor.  Ex. 7, pp. 50-52.

12. Angel Maldonado testified during his deposition that while he was in Texas, the thermostat on the heating system in the Pueblo West Home was set at 55 degrees.   Ex. 1, pp. 25, 41, 51.

13. Both Sgt. and Mrs. Maldonado testified that at no point while they were in Texas was the heating system in the Pueblo West Home ever turned off.  Ex. 1, p. 51-52; Ex. 2, p. 93.

14. The section of pipe in the Pueblo West Home that froze and burst was located in the attic of the home.  Ex. 3, Deposition of Steve Dennison, p. 14; Ex. 4, Deposition of Ernie Bernal, p. 20.

15. Sgt. Maldonado had made attempts to ensure the pipes in the attic were adequately covered with insulation.  Ex. 1, pp. 50, 51.

16. Mr. Collins stated during Allstate's deposition that a determination as to whether the pipes that caused a "freeze loss" were located in an area of the home that

was not heated with the rest of the house is important in an investigation of a claim. Ex. 7, Deposition of Allstate, p. 37.

17. Mr. Collins stated during Allstate's deposition that if the pipe that froze was in an area that was not heated, as long as the heat was maintained in the structure, there would be coverage under the policy. Ex. 7, Deposition of Allstate, p. 36, 37.

18. Phillip Spallo, Allstate's adjustor on the Maldonados' claim, testified that from the beginning of his investigation, he was aware of the fact that the pipe that had burst was located in the attic of the Pueblo West Home. Ex. 5, Deposition of Phillip Spallo, p. 20.

19. Mr. Spallo used the Maldonados' Xcel bills for November and December 2009 to determine that the Maldonados failed to maintain heat in the Pueblo West Home. Ex. 5, Deposition of Phillip Spallo, pp. 25, 26, 32, 33; Defendant's Statement of Undisputed Facts, paragraph 4.

20. The Maldonados' Xcel bill for December was generated on December 8, 2009 and showed therm usage at 2. Payment for the December bill was due December 23, 2009. Ex. 6, Xcel Energy Bills, Defendant's Bates No. AIC00084-AIC00086.

21. In the first week of December 2009, temperatures in Pueblo, Colorado reached as high as 64 degrees. Ex. 8, NOAA Record of River and Climatological Observations for Pueblo Reservoir in December 2009.

22. In the days immediately following December 8, 2009, temperatures in Pueblo, Colorado reached eight degrees below zero.  Ex. 8, NOAA Record of River and Climatological Observations for Pueblo Reservoir in December 2009.

23. Therm usage for the Maldonados' January Xcel bill, which was generated on January 11, was 121.  Ex. 6, Xcel Energy Bills, Defendant's Bates No. AIC00084-AIC00086.

24. Mr. Collins testified that Allstate does not have a minimum figure for an energy bill nor a minimum temperature required in order to make a determination that a homeowner used reasonable care to heat the home.  Ex. 7, Deposition of Allstate, p. 54.

## IV. STANDARD FOR GRANTING A MOTION FOR SUMMARY JUDGMENT/DETERMINATION OF LAW

Pursuant to the Court's September 13, 2010 Scheduling Order, the deadline for submission of dispositive motions was May 3, 2011.  Allstate filed this Motion on June 8, 2011.  Allstate filed this Motion more than one month after the deadline for such filings.  As such, the Court should deny Allstate's Motion to the extent that it is dispositive on the issue regarding the exclusion in the policy.

In the event that the Court chooses to waive the filing deadline requirement for Allstate, summary judgment should be granted only if there is no genuine issue as to any material fact, and the burden so to demonstrate is on the moving party. *Westerman v. Rogers*, 1 P.3d 228, 230 (Colo. App.1999).

A court must consider the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, in determining whether to grant a motion for summary judgment. *Id.* The nonmoving party is entitled to the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts. *Id.* Once the moving party makes a convincing showing that there are no genuine issues of material fact, the opposing party must demonstrate with relevant and specific facts that a real controversy exists. The opposing party may not rest upon mere allegations or denials in its pleadings, but must provide specific facts demonstrating the existence of a genuine issue for trial. *Id.*

## V. LEGAL ARGUMENT

The Maldonados assert that the exclusion cited by Allstate to deny coverage does not apply because: 1) the home was *not* unoccupied at the time of the damage; and 2) even if the home could be deemed unoccupied at the time of the damage, the Maldonados did use reasonable care to maintain heat in the home.   The Court should make the determination that the Maldonados' home was not unoccupied under the terms of the contract.   Should the Court make a determination to the contrary, the Court should nonetheless deny Allstate's Motion as a factual dispute exists as to whether the Maldonados took reasonable care to maintain heat in the home.

### A. The home was not "vacant" or "unoccupied" at the time of the loss

Although the term "unoccupied" is not defined in the insurance policy, the principles of contract interpretation, as applied to the facts here, lead to the conclusion

that the Maldonados' home was not unoccupied at the time of the loss.

An insurance policy is a contract which should be interpreted consistent with the well settled principles of contractual interpretation. *Compass Ins. Co. v. Guaranty Nat'l Ins. Co.*, 984 P.2d 606, 613 (Colo. 1999). With regards to insurance contracts, courts will enforce the policy as written unless the policy contains an ambiguity. *Cary v. United of Omaha Life Ins. Co.*, 108 P.3d 288, 290 (Colo. 2005). An insurance policy is ambiguous if it is susceptible on its fact to more than one reasonable interpretation. *Id.* Any ambiguity in an insurance policy is construed in favor of providing coverage to the insured. *Id.* Words used in an insurance policy are given their plain and ordinary meaning unless a contrary intent is indicated in the contract. *Compass* at 613. Courts look to definitions contained in dictionaries to determine the appropriate definitions to use in interpreting insurance policies. *See, e.g., Kane et al v. Royal Ins. Co. of America*, 768 P.2d 678, 681 (Colo. 1989). The dictionary defines the term "unoccupied" as "not lived in: empty." Merriam-Webster's Collegiate Dictionary (10th ed. 1998).

The Seventh Circuit Court of Appeals has further interpreted the Allstate exclusion and the meaning of unoccupied, applying Indiana law. The Court held that "'occupancy'…implies the presence of human beings as at their customary place of abode, not absolutely and uninterruptedly continuous, but that must be the place of usual return and habitual stoppage." *Estate of Wavie Luster v. Allstate Ins. Co.*, 598 F. 3d 903, 906 (7th Cir. 2010). Further, "[a] person's dwelling constitutes not the boundaries but the focal point of his life. He does not cease to have a home when he is

14

temporarily absent there from, nor does his home cease to be an occupied dwelling.  It is not his physical presence but the habitual recurrence of that presence that renders a dwelling occupied." *Id.*  The Court went on to state:

> Houses are rarely occupied continuously. A homeowner might take a 31-day trip; Allstate implies that if a fire occurred during that period the insured would be uncovered. That is not the law...A person who owns a vacation home may spend the summer months away from his primary home; the homeowner's policy on his primary home doesn't lapse. What is true is that a homeowner's policy is site-specific; a homeowner who has a second (or a third or a fourth, etc.) home will have either to add each one as an endorsement to the homeowner's policy on his primary home or buy a separate policy covering his other home(s).  Allstate's argument thus implies that if you have a second home the homeowner's policy on your primary residence is illusory; you're away a lot and so coverage lapses. That's nonsense.

*Id.* at 908, 909.  Courts in different jurisdiction have found that in scenarios with facts similar to those here, the house at issue was *not* unoccupied under the applicable insurance policy.  *See Smutz v. Cen. Iowa Mut. Ins. Assoc.,* 2007 Iowa App. LEXIS 1119 (finding that a tenant that was in the process of vacating the property, though still had belongings in the home and intended to return, had not left the home unoccupied); *Monarch Ins. Co. of Ohio v. Rippy,* 369 P.2d 622 (Okla.

1962) (finding that the homeowners that were on a three-month vacation were only temporarily absent, that the absence was not an unreasonable length of time, and that the home was not unoccupied.); *but see McCabe v. Allstate Ins. Co.*, 688 N.Y.S.2d 764 (N.Y Sup. Ct. 1999)(holding that it is the regular presence of inhabitants that makes occupancy).

The term "unoccupied" is susceptible to more than one definition, as is apparent from the different definitions given by the dictionary and the various courts, as noted above. Further, Allstate gave yet another interpretation of the meaning of the word, claiming that leaving one's home for any reason and, apparently, for any amount of time, leaves the home unoccupied under the policy. See Statement of Additional Disputed Facts, ¶ 11.

These vastly different interpretations of occupancy constitute an ambiguity in the insurance contract and, based on principles of contract interpretation, that ambiguity should be resolved in favor of the Maldonados by finding that the home was not unoccupied at the time of the loss. *Cary*, 108 P.3d at 290.

Even if the Court finds that the term is not ambiguous under the policy, the dictionary definition of "not lived in: empty" requires the Court to find the home was not unoccupied by the Maldonados. The Maldonados' home was filled with furniture, clothing, and the majority of the Maldonados' personal belongings. See Statement of Additional Disputed Facts, ¶¶ 3-4, 9. Because the home was not empty and was the home in which the Maldonados lived while they were in Colorado, the home was not

unoccupied under the dictionary definition.  See Statement of Additional Disputed Facts, ¶¶ 1-9.

Further, the 7th Circuit, as stated above, has found the term unoccupied does not mean continuous occupation.  *Estate of Wavie Luster*, 598 F.3d at 906.  Mrs. Maldonado took only one bag with her to stay in the travel trailer, as their stay in Ft. Hood was temporary, and they scheduled regular, habitual returns to visit the Pueblo West home.  See Statement of Additional Disputed Facts, ¶¶ 1-9.  The Maldonados intended to live in the home and to spend their retirement there.  See Statement of Additional Disputed Facts, ¶ 8.  As such, the Pueblo West home meets the 7th Circuit's standard for being occupied.  *Estate of Wavie Luster*, 598 F.3d at 906.

Finally, the interpretation of the term "unoccupied" given by Allstate should be rejected, as it would violate Colorado's doctrine of reasonable expectations.  The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.  *St. Farm Mut. Auto. Ins. Co. v. Nissen*, 851 P.2d 165, 167.  Further, an insurance contract's terms are to be construed as they would be understood by a person of ordinary intelligence.  *Id.*

Allstate offers no proposed definition of the term "unoccupied" in its Motion.  Rather, it gives a catch-all phrase for multiple terms used in the policy, stating that the "plain meaning" interpretation of "vacant, unoccupied or being constructed" is that "the Property was not occupied at the time of the loss."  It is apparent, however, from

Allstate's deposition that Allstate in fact applies a much narrower understanding of the term "unoccupied," as set forth above.  See Statement of Additional Disputed Facts, ¶¶ 9-10.  That interpretation does not pass the reasonable expectations test under Colorado law.  The Maldonados are ordinary citizens of ordinary intelligence without experience in drafting, reviewing, or interpreting insurance contracts.  The Maldonados did not expect that every time they left the home for work, for errands, or even merely left the perimeter of their yard, they were potentially causing exclusions to apply to their homeowner's insurance policy.  The interpretation of "unoccupied" given by Allstate does not meet the Maldonados' reasonable expectations of their insurance coverage, and the Court must therefore reject such interpretation.

**B.  The Maldonados did use reasonable care to maintain heat in the home**

Even if the Court determines that the Maldonados' home was unoccupied, a factual dispute still remains as to whether the Maldonados took reasonable care to maintain heat in the home in their absence.  The thermostat in the home was set at 55 degrees and that heat was never shut off.  See Statement of Additional Undisputed Facts, ¶¶ 12-13.  The Maldonados also arranged for Mrs. Maldonado's father to check on the home periodically in their absence.  See Statement of Additional Undisputed Facts, ¶¶ 16.  Contrary to Allstate's argument, the Xcel Energy records showing low thermal usage in the home are not dispositive of the issue of heat in the house for several reasons.  First, the Maldonados' home was constructed in such a way that placed certain pipes in the attic of the home, including the pipes that froze and caused

18

the damage at issue here.  See Statement of Additional Disputed Facts, ¶ 14.  Although

Sgt. Maldonado had made attempts to ensure that the pipes were sufficiently covered

by insulation, the attic was not heated with the main structure of the home, and it is

logical, therefore, that the temperature inside the attic was lower than the temperature

in the main portion of the house.  See Statement of Additional Disputed Facts, ¶ 15.

Allstate based their denial on Xcel records that reflected thermal usage only up through

December 8, 2009.  See Statement of Additional Undisputed Facts, ¶ 19.  During the

first week of December 2009, Pueblo saw temperatures in the mid-sixties, which would

have naturally warmed the home and, with a thermostat set at 55 degrees, would not

have caused the heat to turn on.  See Statement of Additional Undisputed Facts, ¶ 21.

However, in the days immediately following December 8, 2009, temperatures in Pueblo

dropped well below zero, and the burst pipes in the Pueblo West Home were

discovered shortly over one week later, on December 17, 2009.  See Statement of

Additional Undisputed Facts, ¶ 22; Defendant's Statement of Undisputed Facts, ¶ 9.

These low temperatures were certainly sufficient to finally cause the temperature of the

home to reach below 55 degrees, thus causing the heating system of the home to kick

in.   The Xcel bill for January, which was generated on January 11, 2010, show therm

usage of 121, compared to 2 from the previous month.  See Statement of Additional

Undisputed Facts, ¶ 20, 23.

　　　Mr. Collins, Allstate's 30(b)(6) deponent, agreed during Allstate's deposition that

a scenario like this could happen in houses where the pipes were not heated with the

discovered shortly over one week later, on December 17, 2009.  See Statement of

Additional Undisputed Facts, ¶ 22; Defendant's Statement of Undisputed Facts, ¶ 9.

These low temperatures were certainly sufficient to finally cause the temperature of the

home to reach below 55 degrees, thus causing the heating system of the home to kick

in.   The Xcel bill for January, which was generated on January 11, 2010, show therm

usage of 121, compared to 2 from the previous month.  See Statement of Additional

Undisputed Facts, ¶ 20, 23.

     Mr. Collins, Allstate's 30(b)(6) deponent, agreed during Allstate's deposition that

a scenario like this could happen in houses where the pipes were not heated with the

home.  See Statement of Additional Undisputed Facts, ¶ 16.  In this situation, the

insured would still have coverage as long as heat was maintained in the home.  See

Statement of Additional Undisputed Facts, ¶ 17.  Mr. Collins further stated that the

homeowner would not have been required to heat the home to a certain temperature or

to maintain a certain thermal usage.  See Statement of Additional Undisputed Facts, ¶

24.

     Mr. Spallo, the adjuster, was aware of the location of the pipes, and should have

been aware that they could have frozen regardless of the themal usage in the home.

See Statement of Additional Undisputed Facts, ¶ 18.  The Maldonados both testified

that they maintained heat in the home and that the thermostat was set at 55, which

complies with the requirements that Allstate described in its deposition.  See Statement

of Additional Undisputed Facts, ¶¶ 12-13.  Despite this, Allstate maintains that the

house was not heated by pointing to December energy bill generated more than one week prior to the discovery of the freeze loss and prior to the below zero temperatures in Pueblo.  See Statement of Additional Undisputed Facts, ¶ 19.  This argument requires Allstate to ignore the fact that warm temperatures in early December would have undoubtedly negated the necessity of the heating system in the house.  See Statement of Additional Undisputed Facts, ¶ 21.  It also requires Allstate to ignore the fact that immediately after the cutoff for the December bill, temperatures dipped below zero, and that the Maldonados' next energy bill reflects a significantly increased thermal usage.  See Statement of Additional Undisputed Facts, ¶¶ 22, 23.  These undisputed facts show that the Maldonados did use reasonable care to heat the home, but the pipes froze nonetheless because of their location and the extreme temperatures.  At the very least, the facts presented here present genuine issues that make partial summary judgment inappropriate.

## VI. CONCLUSION

The principles of contract interpretation mandate that where ambiguity exists, as it does here, the Court should interpret the contract in favor of finding coverage for the insured.  Therefore, the Court should find that the Pueblo West Home was *not* unoccupied at the time of the loss.  Even assuming *arguendo* that the home was unoccupied, the Maldonados maintain that they did take reasonable care to heat the home in their absence, and the exclusion therefore should not apply.  At the very least, the Maldonados have raised genuine issues of material fact as to the issue of

reasonable care.  As such the Court should deny Allstate's Motion and deny the relief requested in its Motion.

WHEREFORE, the Maldonados request that the Court DENY Allstate's Motion for Determination of Question of Law and Brief in Support.

DATED this ____ day of July, 2011.

Respectfully submitted,

/s/Amanda Janulis
Richard P. Ranson
Jason P. Kane
Amanda P. Janulis
RANSON & KANE, P.C.
3475 Briargate Blvd., Suite 201
Colorado Springs, CO  80920
Phone:     (719) 593-2121
Fax:         (719) 593-1818
E-Mails:   ranson@ranson-kane.com
             jkane@ranson-kane.com
             ajanulis@ranson-kane.com
*Attorneys for Plaintiffs*

22

**CERTIFICATE OF SERVICE**

I hereby certify that on this _5th_ day of July, 2011, a true and correct copy of the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANT ALLSTATE INSURANCE COMPANY'S MOTION FOR DETERMINATION OF QUESTION OF LAW AND BRIEF IN SUPPORT** was ☒ served on the following via PACER Electronic Case Filing / ☐ served on the following by placing in the U.S. Mail, postage prepaid and properly addressed as follows:

Richard A. Orona, Atty. Reg. #35299
Harris, Karstaedt, Jamison & Powers, P.C.
10333 E. Dry Creek Road, Suite 300
Englewood, CO  80112

*Attorneys for Defendant Allstate Insurance*
  *Company*

/s/*Amanda Janulis*
Amanda Janulis

23