IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 10-cv-01413-RBJ-KMT

DARLENE MALDONADO and
ANGEL MALDONADO,

    Plaintiffs,

v.

ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY,

    Defendant.

## ORDER

    Defendant Allstate Fire and Casualty Insurance Company, which indicates that its correct name is Allstate Insurance Company, moves for a determination that it properly denied coverage for water damage to plaintiffs' home under an exclusion in their homeowner's policy. For the reasons set forth herein the motion is denied.

**Facts**

    Darlene and Angel Maldonado purchased a home at 780 East Clarion Drive in Pueblo, Colorado in 2001 or 2002. Mr. Maldonado was a sergeant in the United States Army, sometimes stationed at Fort Carson near Colorado Spring and at other times stationed in other overseas and domestic locations. In approximately June 2009 he was assigned to Fort Hood in Texas for a one or two year period. In July 2009 he began his tour at Fort Hood. His wife Darlene took a leave from her job as an elementary school paraprofessional in order to join him at Fort Hood. They left clothes and, apparently, most of their possessions in their home in Pueblo.

During the period July through December 2009 the Maldonados traveled to Pueblo approximately every other month to check up on their home, typically for only one night or so each time. In months when they did not return, Mrs. Maldonado's father, who lived in Denver, drove to Pueblo to check out the house for them. The Maldonado's last visit to their home before the incident that gives rise to this lawsuit occurred in early to mid-November 2009. Neither the Maldonados nor Mrs. Maldonado's father found anything amiss during these visits. Likewise, a neighbor who was keeping an eye on the house from outside while the Maldonados were gone reported nothing amiss.

The Maldonados left Fort Hood in their truck on December 23, 2009, arriving at their Pueblo home in the very early morning hours of December 24. Mrs. Maldonado found a red tag on the front door indicating that the water department had turned off their water. The door did not open until Mr. Maldonado was able to push his way in. Inside they discovered that the home had been all but destroyed by leaking water. Water in one or more pipes, apparently in the attic, had frozen causing the piping to burst and the house to be flooded.

Mr. Maldonado immediately called Allstate. Approximately two or three hours later, while the Maldonados waited in their truck outside the home, an adjustor named Phillip Spallo returned the call. Mr. Maldonado's recollection is that Mr. Spallo told him that Allstate had two other homes in the area with the same problem, but that there was nothing he could do because the policy did not cover damage from frozen pipes. However, Mr. Maldonado also recalls that Mr. Spallo requested copies of the Maldonados' heating bills for November and December 2009.

The heating bills for the two months were supplied and are in the record as Exhibits C [#28-5] and E [#28-7]. Exhibit C shows that for November 2009 (for 29 days through November 5) the Maldonados were billed $10.83 for gas and had "thermal usage" of "0", compared to

2

thermal usage of "43" in November 2008.  For December 2009 (for 33 days through December 8) they were billed $12.15 and had thermal usage of "2," compared to thermal usage of "96" in December 2008.  After receiving the November and December bills Allstate formally denied coverage.[1]

In his deposition Mr. Maldonado testified that he had raked insulation, which had been pushed into the corners of the attic, over the pipes.  A. Maldonado deposition [#28-2] at 50.  However, Mrs. Maldonado's father indicated that when they gutted the home after the water damage, he observed that there was no insulation over the pipes.  Bernal deposition [#31-5] at 19.

Mr. Maldonado also testified that the home had an electronically operated heating system that permitted him to set a temperature at which the heat would kick on.  *Id.* at 25-26.  He set the temperature at 50 degrees during the summer months.  He is "pretty sure" that he reset it at 55 degrees when the Maldonados visited the home in September 2009, and he thinks it was set at 55 degrees when they left from their visit in November.  *Id.* at 25, 41.  However, the power was off when the Maldonados discovered the damage on December 24, 2009.  *Id.* at 31.  They turned the power on when they blew the insulation out of the attic.  *Id.* at 40.

Mrs. Maldonado testified that pipes had frozen at least three or four previous times but on those occasions they had not burst or caused damage.  Each time her father came and thawed them out.  She did not know how he did it, and he did not do anything to prevent the pipes from freezing again.  D. Maldonado deposition [#28-3] at 18-1.  She states that on those occasions she

---

[1] The parties dispute the significance of the fact that there were some relatively mild temperatures on several days early in December, some colder temperatures beginning about the time the December billing ended, and greater thermal usage shown in the bill for the 32 days between December 9, 2009 and January 10, 2010.  The Court draws no inferences either way.  Allstate has put together a demonstrative chart derived from the Maldonados' heating bills in cold weather months beginning in February 2007 and ending in March 2010.  Motion at 8.  The chart shows that the monthly invoice ranged from $32.96 to $142.58, and thermal usage ranged from 42 to 175.  However, it appears that Allstate had only the November and December 2009 and 2008 figures when it denied the claim.  Deposition of Phillip Spallo [#31-6] at 26; Reply Brief at 2.

3

was living in the home, and she had maintained the heat at about 70 degrees. *Id.* at 22. Mr. Bernal recalls that he fixed pipes in the bathrooms "about two times." Bernal deposition at 16-17.

The policy excludes coverage for property loss caused by the freezing of plumbing while the house is "vacant, unoccupied or being constructed" unless that policyholder has used "reasonable care" either to "maintain heat in the building structure" or to shut off the water supply and drain the system and appliances. Exclusion A [#28-6]. Allstate seeks a ruling as a matter of law "that Plaintiffs failed to take reasonable steps to maintain heat at the Property while the Property was vacant or unoccupied in violation of their Homeowners Insurance Policy and therefore, Exclusion A of the Policy relating to frozen pipes supports the denial of coverage for Plaintiffs' water loss in accordance with Colorado law."

**Conclusions**

Unoccupied

Allstate first argues that the home was "unoccupied" when the loss occurred, citing as "of critical importance" that both Maldonados testified in their depositions that the property was unoccupied. Actually, Mr. Maldonado testified that his definition of "occupied" is "living there permanently," and by that definition, the house was not occupied. A. Maldonado depo. [#28-2] at 16. When asked whether the house was unoccupied at the time of the loss, Mrs. Maldonado responded, "meaning that we weren't there?" Using that definition she agreed that the house was unoccupied.

In any event, terms in an insurance contract are not defined by a policyholder's attempted definition in a deposition. Rather, construction of terms in an insurance policy, like any contract, is a matter of law for the Court. The Maldonados now suggest that the dictionary definition of

4

"unoccupied" is "not lived in: empty." They note, as have cases cited in their response, that it is not uncommon for people to leave their homes for periods of time, perhaps on an extended vacation or while occupying a second home, but that this does not mean that their home is unoccupied.

One case cited by the plaintiffs is *Estate of Wavie Luster v. Allstate Ins. Co.,* 598 F. 3d 903, 906 (7th Cir. 2010), which involved a term in an Allstate policy similar, though not identical, to that involved here. An elderly widow, living alone, was injured in a fall and, after leaving the hospital, moved into an extended care facility. Meanwhile, no one lived in the house, although her lawyer, who had her power of attorney, continued to pay the insurance premiums. A fire caused extensive damage to the home three months after the woman's death. Allstate, which theretofore was unaware that she was not living in the home, cancelled the policy, returned the premiums, and denied the estate's claim. The court, applying Indiana law which it considered to be consistent with insurance law generally, indicated that a person need not be living in a home at every moment for it to be "occupied," but that "'there must not be a cessation of occupancy for any considerable period of time.'" *Id.* at 906 (quoting an 1898 Indiana case). The court interpreted case law as indicating that the homeowner tends to prevail when the absence is for fewer than three months, while the insurer tends to prevail when the absence is longer and the owner's plans to return are uncertain or indefinite. *Ibid.* The court held that it did not have to try to pinpoint the date on which, regardless of the owner's intentions, the house has undergone a change in occupancy, because by any reasonable measure, a house that is empty for four and one-half years cannot be described as occupied. *Id.* at 907.

The terms "unoccupied" and "vacant" were not defined in the policy. As indicated above, a home is not necessarily "unoccupied" or "vacant" simply because the homeowner is not

always there.  It depends on the circumstances.  Here, the Maldonado's had been living in a trailer at Fort Hood for approximately five months when the damage occurred.  They left much of their personal property in the home and intended to return on a permanent basis.  Mr. Maldonado testified that he intended to retire in that home.  A. Maldonado depo. [#28-2] at 12. In the meantime, they or Mrs. Maldonado's father had checked the house monthly to make sure everything was ok.

The meaning of the term "unoccupied" is not necessarily ambiguous, but the term must be defined.  The Court concludes that the plaintiffs' tendered dictionary definition of the term, "not lived in: empty'" is reasonable.  I note that Allstate's Rule 30(b)(6) representative testified that Allstate also refers to dictionary definitions when terms are not defined in the policy. Collins deposition [#31-7] at 45-46.  The Court finds that a rational finder of fact could, on the facts described in the parties' respective briefs, find either that the house was occupied or that it was unoccupied.  Whether this home was unoccupied under that definition is a fact issue to be resolved by the jury.

<u>Reasonable care to maintain the heat</u>

Even apart from the dispute concerning the meaning of "unoccupied," however, there is a fact issue as to whether the Maldonado's exercised "reasonable" care to maintain an appropriate level of heat.  On the one hand, Mr. Maldonado thinks he set the heat to go on at 55 degrees. Ms. Maldonado testified that the pipes had frozen on multiple occasions in the past even though she was present and had maintained the interior heat at around 70 degrees.  Mr. Spallo is said to have told Mr. Maldonado that Allstate had two other customers in the area with similar problems at the same time as the Maldonados' incident.  If so, did their pipes burst?  Were the homeowners living in those homes at the time?  At what temperature had the heat been

6

maintained in those homes when the damage occurred? Were the pipes in the other homes similarly constructed, insulated and located? Is the problem one of faulty construction rather than faulty maintenance?

On the other hand, the fact is that the Maldonado's "thermal usage" was nil for time period covered by the November 2009 heating bill and de minimis for the period covered by the December 2009 bill. Allstate states that these readings mean that the heat did not go on beyond maintaining the pilot light. According to Mrs. Maldonado, on each of the prior occasions when water in the pipes froze, no measures were taken to prevent recurrences. They did not have the water shut off during the cold weather months. Would a reasonable homeowner in the same or similar circumstances have done more, such as improving the insulation around the pipes, or maintaining the heat at a higher level, or other measures?

The Court finds that whether the Maldonados exercised reasonable care to maintain an appropriate level of heat in the circumstances is appropriate for a jury's determination.

**Order**

For the foregoing reasons, motion #28 is DENIED.

DATED this 19th day of March, 2012.

BY THE COURT:

_____
R. Brooke Jackson